NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2017 VT 31

No. 2016-012

In re Eric S. Brittain, Esq.

Supreme Court

Original Jurisdiction

From
Character and Fitness Committee

October Term, 2016

Neal Rodar, David E. Tartter, Esq. and Herbert J. Downing, Esq., Panel Members

Robert Appel, Burlington, for Petitioner-Applicant.

William H. Sorrell, Attorney General, and Benjamin D. Battles, Assistant Attorney General, Montpelier, for Respondent-Appellee.

PRESENT: Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.

¶ 1.     **ROBINSON, J.**     Applicant appeals the decision of the Vermont Character and Fitness Committee to decline to certify his good moral character and fitness, which prevented his admission to the Vermont Bar. We affirm.

¶ 2.     Applicant applied for admission to the Vermont Bar in March 2015. Pursuant to what was then Vermont Rule of Admission to the Bar 11(d), the Character and Fitness Committee appointed a member of the Committee to investigate applicant's moral character and fitness and to decide whether to certify applicant's admission. The member assigned to applicant's application reported in July that he could not recommend applicant's admission. The member noted three areas of concern: applicant's disciplinary history in Wisconsin, including multiple contempt charges and a public reprimand; other "inappropriate past activity," including speeding

tickets, a conflict with a previous employer, and applicant's failure to take responsibility for those occurrences; and his record of financial difficulties.

¶ 3.    Pursuant to Rule 11(g), the Committee convened a three-member panel to hold an evidentiary hearing to allow applicant the chance to present additional information to support his application.  At that December 2015 hearing, applicant and the panel agreed that the record to be considered by the Committee consisted of his application to the Vermont Bar, including attachments, the written record of his application to practice law in the State of Washington, and correspondence between applicant and the Committee.  Applicant testified under oath and answered questions from members of the panel.

¶ 4.    In a written decision issued in January 2016, the hearing panel acting on behalf of the Committee declined to certify applicant's good moral character and fitness.  Such certification is a prerequisite to admission to the Vermont Bar.  The panel's written findings include the following.

- Applicant graduated from the University of Wisconsin Law School in 2002 and was admitted to practice in Wisconsin in 2003.

- He is an attorney in good standing in Wisconsin, the U.S. District Courts in Wisconsin, and the U.S. Court of Appeals for the Seventh Circuit.

- From 2003 to 2006, he was employed as a lawyer with the Wisconsin State Public Defender's.  In 2005, friction developed between applicant and his employer concerning a policy issue involving juvenile defendants.  Applicant expressed his views on the issue publicly, was suspended for insubordination, and resigned in July 2006 to go into private practice.  Applicant does not regret his vigorous advocacy in connection with the policy question.

- From July 2006 through May 2012, applicant was self-employed as a lawyer in Wisconsin, specializing in representing indigent criminal defendants.

- In November 2008, in the matter of State v. Kostopoulos, applicant was held in contempt of court for insubordination to the court.

2

- In November 2009, in the matter of <u>State v. Carter</u>, applicant suggested in the course of a hearing on a routine discovery motion that the judge suffered from a physical health issue that affected her "ability to be appropriate."

- As a result of the two above incidents, the Wisconsin Office of Lawyer Regulation filed a disciplinary complaint against applicant in June 2012. Applicant ultimately admitted the allegations of the complaint, did not oppose the imposition of a public reprimand, and agreed to pay specified costs. Applicant did not contest the proceedings because litigation would have interfered with his family's travel plans and because his lawyer told him it was a "set up," that he had little chance of success, and that he faced greater financial exposure if he contested the charges.

- In July 2010, applicant was held in contempt in the case of <u>State v. Echols</u> for ignoring instructions of the court, insisting on referring to his client by first name, and injecting his personal views.

- In April 2011, applicant was held in contempt twice in the same proceeding, <u>State v. Donald</u>—once for a personal attack on the prosecutor, and once for inappropriate behavior during voir dire.

- In August 2011, applicant was charged with violating a municipal ordinance relating to airport security. Applicant had gotten into a dispute with a TSA officer after he refused to present identification as part of the pat-down process.

- In December 2011, a bank initiated foreclosure proceedings against applicant and his wife for a condominium property. The condominium had been damaged by high water and was partly uninhabitable. The applicant did not have adequate insurance to cover the loss. Applicant abandoned his home to the bank. He is unaware of any deficiency liability claimed by the mortgagees.

- Applicant closed his law practice at the end of May 2012. He maintains that he cannot practice law in Wisconsin because of unfair treatment by Wisconsin judges in retaliation for his efforts to uncover the racially motivated illegal activities of the Milwaukee Police Department and District Attorney's office.

- In October 2012 applicant wrote an open letter to the United States Department of Justice stating that his contempt citations in the <u>State v. Echols</u> and <u>State v. Donald</u> cases and his problems in <u>State v. Carter</u> were the result of his attempts to expose corruption in the Milwaukee Police Department and District

Attorney's office. The applicant submitted this letter to the Character and Fitness Committee to support his contention that the initial reviewer of his application was not treating him fairly.

- From June 2012 to January 2014 applicant lived in New Zealand. He has lived in the State of Washington since January 2014.

- Applicant is repaying approximately $260,000 in student loans.

- In May 2013, applicant applied for admission to the bar of the State of Washington. After a day-long hearing on his application, including numerous witnesses regarding the above incidents, the Character and Fitness Board voted eight to one to grant his application for admission. The Washington Supreme Court denied the application in November 2014.

- In the Vermont proceeding, applicant has registered his concern that he is not being treated fairly and that he is being punished for being a whistleblower against illegal state action. He was not able to show any direct causal link between his zealous advocacy on behalf of indigent, minority clients in Wisconsin and his disciplinary issues, but argued that denying his application to practice in Vermont would be tantamount to "aiding and abetting" the unjust treatment he received at the hands of the authorities in Wisconsin.

¶ 5. On the basis of these facts, the Committee concluded that there was nothing in the record to suggest that applicant was dishonest or could not be trusted to carry out his responsibilities as a lawyer. It further concluded that the bankruptcy was fourteen years ago and not relevant to his present fitness, the foreclosure of his property was a result of a natural disaster and not necessarily any fiscal mismanagement, and applicant was current on his student loans.

¶ 6. However, citing his four contempt citations by three different judges, and his stipulated violations of the rules of professional conduct on two occasions, the Committee concluded that the applicant's past professional conduct "demonstrates a lack of restraint in the courtroom and a disturbing tendency to imprudently challenge those he perceives as obstacles to his zealous advocacy." The Committee acknowledged that taken individually the incidents might be dismissed as petty squabbles between an overly zealous lawyer and an unsympathetic judge. But it concluded, "[a]s a whole, they demonstrate a disturbingly self-destructive pattern of

4

behavior that has plagued the applicant since he was first licensed." The Committee noted that applicant's employment dispute and his difficulties with the TSA "further demonstrate a lack of respect for persons in authority and refusal to follow orders and instructions that contradict his personal code of ethics."

¶ 7. The Committee concluded that applicant's "undignified and discourteous conduct over several years . . . is directly contrary to the state's legitimate interest in protecting prospective clients and the system of justice." The panel cited commentary to the Vermont Rules of Professional Conduct that advises that a lawyer should refrain from abusive or obstreperous conduct. V.R.Pr.C. 3.5(d) cmt. 4. The comment explains that a lawyer may "stand firm against abuse by a judge," but should not reciprocate: "An advocate can present the cause, protect the record for subsequent review, and preserve professional integrity by patient firmness no less effectively than by belligerence or theatrics." Id. The panel concluded that applicant had repeatedly "chosen belligerence and theatrics over protecting the record for subsequent review."

¶ 8. Finally, in concluding that there is nothing in the record to suggest that applicant's character traits will not result in future violations of the Rules of Professional Conduct if he is permitted to practice in Vermont, the Committee put great weight on the fact that applicant has not taken responsibility for his actions. Although he testified in vague terms about plans to adjust his approach in the future to find ways to reduce friction with judges, the gist of his testimony before the Committee was that his contempt citations and disciplinary investigation were acts of retribution in response to his successful advocacy for indigent minority clients.

¶ 9. Following the hearing, the Committee issued a decision in January 2016 concluding that applicant does not possess the necessary character and fitness to be admitted to the Bar. A certification of applicant's fitness is a prerequisite to admission. V.R.A.B. § 11(a).

¶ 10. Emphasizing applicant's past disciplinary record and his failure to take responsibility for his misconduct, the Committee determined that applicant's prior conduct was

"directly contrary to the state's legitimate interest in protecting prospective clients and the system of justice." Applicant appealed the decision to this Court. V.R.A.B. § 11(h).

¶ 11. The applicable rule requires each applicant to "possess good moral character and fitness." V.R.A.B. § 11(a) (Supp. 2013).[1] "Good moral character" is a "functional assessment." V.R.A.B. § 11(b)(1) (Supp. 2013). The purpose of the character requirement is "to exclude from the practice of law those persons possessing character traits that are likely to result in injury to future clients, in the obstruction of the administration of justice, or in a violation of the Rules of Professional Conduct." Id. These character traits typically involve "dishonesty or lack of trustworthiness in carrying out responsibilities." Id. Other traits may be relevant, but "such traits must have a rational connection with the applicant's present fitness or capacity to practice law and accordingly must relate to the state's legitimate interests in protecting prospective clients and the system of justice." Id. "The burden of proof of good moral character and fitness is upon the applicant." V.R.A.B. § 11(c) (Supp. 2013).

¶ 12. On appeal, applicant argues generally that the record does not support a conclusion that he lacks the requisite character or fitness for admission to the Vermont Bar. He also argues more specifically that the panel erred in considering his past conflict with a former employer as relevant to his present moral fitness, in concluding that he had not accepted responsibility, and in describing his detention at the airport as an arrest, rather than a civil violation. We consider these various contentions together.[2] Considering the applicable standard of review and the evidence in

---

[1] As discussed more fully below, we are applying the rule in effect throughout the course of applicant's application process, rather than the amended version that took effect in April 2016.

[2] Applicant also argues that the panel erroneously considered the Washington Supreme Court's denial of his admission to the Washington State Bar and his past debt in reaching its conclusion. We reject both of these arguments summarily. The Committee's decision did not in any way rely on the fact that applicant had been denied admission in Washington. To the extent the Committee relied on the extensive record from the proceeding in Washington, it did so pursuant to applicant's request. The Committee's analysis below turned on the content of that record, not the outcome of that proceeding. Moreover, the Committee expressly stated in its decision that applicant's various financial challenges were not relevant to its analysis. Likewise, in this appeal

6

the record, we conclude that applicant has not demonstrated the requisite character to practice law in Vermont.

## I. Standard of Review

¶ 13. Our decision in this case does not rise or fall with the applicable standard of review. However, because we have not articulated our standard of review since we amended V.R.A.B. § 11 in 2011, we consider it here.

¶ 14. Prior to 2011, a different process, with a potentially distinct standard of review, applied to appeals from the Character and Fitness Committee. Then-Rule 11 provided that, upon petition by an applicant denied admission on the basis of a determination by the Committee, the Court would appoint a commissioner to conduct an evidentiary hearing and issue a report of findings and conclusions. If the commissioner issued an unfavorable decision, the applicant could then appeal that decision to this Court. The Rule authorized this Court to "take any action consistent with its constitutional authority." V.R.A.B. § 11(l)(2) (amended 2011).

¶ 15. Pursuant to this standard, our review of the commissioner's factual findings was apparently less deferential than our typical review of a lower tribunal's findings. See In re Bitter, 2008 VT 132, ¶ 18, 185 Vt. 151, 969 A.2d 71 (" 'The facts reported by the commissioner do not have the same standing as findings of fact made by a master or auditor. It is the responsibility of this court to take appropriate action on those facts we find are supported by competent and material evidence and then arrive at a decision.' Thus, although we are aided by the Commissioner's findings, we are not bound by them . . . ." (quoting In re Monaghan, 126 Vt. 53, 57, 222 A.2d 665, 669 (1966))). Moreover, our review of the ultimate question of character and fitness was plenary, with no deference to the recommendation of the commissioner below. See id. ¶ 18 ("[U]ltimately, it is this Court that 'must be convinced of the applicant's good moral character and fitness.' " (citing Monaghan, 126 Vt. at 57, 222 A.2d at 679)).

we attribute no significance to the ruling of the Washington Supreme Court or applicant's financial history.

¶ 16.    In 2011, we amended Rule 11 to eliminate the requirement of a hearing before a commissioner and instead provided for direct review by the Court of the Committee's findings and conclusions.  V.R.A.B. § 11(i) (Supp. 2013).  Like its predecessor, the amended Rule 11 provided that the Court "may take any action consistent with its constitutional authority" in connection with that review.    But after the amendment, the Court was directly reviewing the Committee's determination.[3]

¶ 17.    We conclude that the amendment does not affect our standard of review, either as to factual findings or legal conclusions.  Our conclusion on this point is dictated by this Court's unique constitutional responsibility with respect to the regulation of the practice of law.  See Vt. Const. ch. II, § 30 ("The Supreme Court shall have . . . disciplinary authority concerning all . . . attorneys at law in the State"); 4 V.S.A. § 901 (assigning to the Supreme Court the authority and responsibility for regulating practice of law); see also In re Morse, 98 Vt. 85, 92-94, 126 A. 550, 552-53 (1924) (recognizing Court's plenary authority to regulate admission and practice of law before Vermont courts).  This authority and associated responsibility underlay the broadly nondeferential standard of review we articulated in Monaghan and Bitter.  The consideration applies with the same force whether we are reviewing a report from a commissioner or a written decision from the Committee.  Like a commissioner, the Committee in this setting serves as an initial factfinder on behalf of the Court.  It is not analogous to a trial court or administrative agency.  Our recognition of the limits of a cold paper record will generally, in practice, lead us to defer to the Committee's credibility determinations and assessment of the evidence.  See Gravel v. Gravel, 2009 VT 77, ¶ 13, 186 Vt. 250, 980 A.2d 242 (recognizing that factfinder "is in a unique position

---

[3]  Subsequently, effective April 2016, the Court adopted a global rewrite of the Rules of Admission.  The provisions governing this Court's review of the Committee's decision now appear in Rule 18.  Because the proceedings below and appellant's notice of appeal precede the effective date of the newest version of the rule, we apply the version in effect prior to April 2016.  However, we see no substantive difference between the newest version of the Rule and the post-2011, pre-April-2016 version with respect to the court's standard of review.  As before, the present rule provides, "[t]he Court may take any action consistent with its constitutional authority."  V.R.A.B. Rule 18(d).

to assess the credibility of witnesses and weigh the persuasiveness of the evidence") (quotation omitted). But we are not bound to do so. Our constitutional authority and responsibility for regulating the practice of law require that we consider the Committee's findings in the context of our own searching review of the record.

## II. Conduct at Issue

¶ 18. The Committee's decision, applicant's arguments on appeal, and our analysis center on a number of specific events, including applicant's suspension by the Wisconsin Public Defender's; conduct leading to multiple contempt charges and a stipulated public reprimand by the Wisconsin Supreme Court for professional misconduct; and violation of a municipal ordinance after applicant failed to follow TSA security procedures. The record evidence surrounding each of these instances is as follows.

### 1. Suspension from the Wisconsin Public Defender's Office

¶ 19. Applicant graduated from law school in 2002 and began working for the Wisconsin Public Defender's in 2003. In July 2005, applicant had a disagreement with his employer about the treatment of juvenile clients in the Wisconsin court system and the Public Defender's stance on a specific juvenile offender program. Applicant opposed a policy requiring juveniles to be shackled when taken to court, and wanted to file a court action challenging the policy. He also urged his supervisors to take a legal stand against a particular juvenile justice program. He expressed his views in multiple strongly worded emails. After applicant's supervisor informed him that he would no longer be working on the shackling policy, applicant sent an email to the members of the Board of Directors for the Wisconsin Public Defender's. In the email, he laid out his objections to his employer's positions on the two issues. The Public Defender's appears to have suspended applicant in December 2005, and he resigned in June 2006 to enter private practice.

¶ 20. On applicant's Vermont Bar application, he disclosed that he was suspended from the Public Defender's and provided the following explanation: "Already on leave due to

9

disagreement with employer over legality of ACE program." When the National Conference of Bar Examiners contacted one of applicant's supervisors at the Public Defender's, the supervisor noted that applicant's description of the suspension was incorrect because "other issues were under investigation." The supervisor marked that he would not rehire applicant and that he had no opinion regarding whether applicant possessed the character and fitness necessary to practice law.

2. Misconduct in State v. Kostopoulos (2008) and Resulting Disciplinary Action (2012)

¶ 21. Applicant was first held in contempt in 2008 during a criminal jury trial. At the beginning of applicant's opening statement, the court interrupted him twice to warn him against referencing personal experiences and vouching for his client:

> [APPLICANT]: . . . I want to talk about violence. And, well, what it is like to be in an environment where people yell and scream. And I know that environment because I grew up in one, and my mom was very erratic, very emotionally unstable.
>
> THE COURT: Counsel, this is inappropriate argument. You're not allowed to reflect on personal items like that. Plus it is argument, not opening statement. Please refocus your remarks at this time.

Applicant then approached his client, put his hands on his client's shoulders, and told the jury, "I know . . . a brave man when I see one." The Court again interrupted, admonishing him for inappropriate conduct and instructing that he was not allowed to vouch for his client. Applicant continued his opening statement, but was again interrupted by the court:

> [APPLICANT]: . . . I'm going to tell you what happened that day. I'm going to tell you about Bill. I'm going to do it in the first person narrative as if I am Bill so that you can know what happened.
>
> THE COURT: I'm not going to allow that, Counsel, that could be confusing. You're the lawyer, you're the advocate, you need to speak as such.

¶ 22. At that point, applicant said he would renew his earlier motion seeking the judge's recusal from the case, stating that the judge was biased. The judge then excused the jury to speak with the lawyers about applicant's actions. During the exchange, applicant challenged the court's rulings and denied that his statements were inappropriate. Applicant also asserted that the judge

10

was acting as a prosecutor in interrupting his opening statement and argued that he was preventing the defendant from having a fair trial. The judge asked applicant to not raise his voice or to "stick [his] finger in [the prosecutor's] face." Before allowing the jury to come back into the courtroom, applicant and the judge had the following exchange:

> THE COURT: . . . . It is for the [c]ourt, consistent with the statutes and the law, to determine how a trial is to proceed . . . . I'm trying to make sure this is fair. You'll not be giving any first person remarks. You'll not be vouching for credibility, or giving personal opinions. You'll not be talking about your personal life experiences. Do you understand?
>
> [APPLICANT]: Your Honor, I will advocate for my client in a way that I believe I have to.

¶ 23.　The jury returned, and applicant continued his opening statement. Before long, he stated, "And so, [l]adies and [g]entlemen, under a lot of—a lot of obstacles, we are here today." The judge again excused the jury. The court subsequently found on the record that while referring to the obstacles his client was facing, applicant stopped his statement to the jury, turned more than ninety degrees to look back at the judge, and paused for three to five seconds. The court concluded that applicant was trying to suggest to the jury that the court was interfering with his client's fair trial rights. After some back and forth with applicant, who said he was only trying to give an opening statement, the judge held applicant in contempt of the court on the basis of the "obstacles" remark and surrounding conduct and imposed a fine. The appellate court upheld the contempt order. See In re Contempt in State v. Kostopoulos, No. 2009AP1253-FT, 2009 WL 3837368, at *11 (Wis. Ct. App. Nov. 18, 2009).[4]

¶ 24.　Based in part on the above incident, the Wisconsin Office of Lawyer Regulation (OLR) pursued disciplinary charges against applicant in 2012. Applicant and the OLR entered

---

[4]  The Court of Appeals' decision affirming the contempt citation quotes more extensively from the transcript, including a number of additional examples of objectionable conduct by applicant that led to admonishment from the court prior to his "obstacles" statement.

into a stipulated resolution whereby applicant admitted the allegations in the OLR complaint and assumed the costs of that proceeding, and the court publicly reprimand him.

   3.  Misconduct in State v. Carter (2009) and Resulting Disciplinary Action (2012)

¶ 25.  Applicant represented another criminal defendant in 2009. This case involved a different judge from the one in State v. Kostopoulos. After the judge accepted the defendant's not guilty plea and prepared to adjourn the proceeding, applicant initiated a further exchange with the court regarding discovery demands. Because the matter was disputed, the judge told applicant that he should file a motion. The judge closed the proceeding for the day. At that point, applicant raised his voice, continued to try to address the court about discovery matters, and said, "You[r] Honor, I believe your behavior is inappropriate."

¶ 26.  The matter subsequently came before the same judge at a final pretrial conference. At the outset of the hearing, the judge systematically listed all of the outstanding motions and issues to be addressed. Applicant interjected throughout the judge's list, interrupting her. When the judge finished reading her list, she asked applicant whether she missed any open issues. Applicant began reading his own list of matters to be addressed, listing first one that the judge had included and emphasized as a priority in reviewing her own list. When the judge asked applicant to simply list the things she missed, he said he wished he had that "super a memory." After a brief back and forth the judge terminated the hearing and left the bench.

¶ 27.  When the court reconvened the hearing in the afternoon, the judge stated the time the court had adjourned the hearing in the morning. Applicant objected to the court's characterization of the end of the morning's proceedings as an adjournment and filed a motion to recuse the judge. The judge explained that she left the bench because she had grown frustrated by applicant's shouting, interruptions, failure to directly answer her questions, and failure to listen when she reviewed all of the outstanding issues. During the ensuing back and forth between applicant and the judge about the propriety of their respective conduct, applicant called the judge's statements about his conduct "ridiculous." With respect to the judge's conduct, he said:

12

[APPLICANT]: I believe that you made physical gestures with your head and your eyes. You had your arms outstretched. You walked quickly off the bench. You raised your voice—behavior I have never seen before and I hope to never see again by any judge in any courtroom. I do not know if there is a physical issue that you were having or some other health issue that has affected your ability to be appropriate, but at this point, I don't think it should affect my client's right to a fair trial.

Applicant also later stipulated that during this hearing he described the court's description of his behavior as "ridiculous."

¶ 28. This incident, and the above exchanges in particular, were the second basis for the 2012 OLR disciplinary action. As with the prior incident, applicant stipulated to the factual allegations, agreed to a public reprimand for professional misconduct, and assumed the costs of the proceeding.

### 4. Misconduct in State v. Echols (2010)

¶ 29. Applicant was held in contempt a second time in 2010, during another criminal jury trial. The court listed three reasons for its contempt citation. First, the court asserted that applicant ignored the judge's repeated orders to not refer to the defendant by his first name. In fact, the judge did order applicant not to use the defendant's first name multiple times but applicant failed to heed the orders. On one of these occasions, the judge and applicant had the following exchange:

THE COURT: Okay. And I don't know what it's going to take, Mr. [Applicant], I really don't. His name in this courtroom is Mr. Echols. I have gone over this with you so many times that I know you're consciously purposely doing this and [it] is against what I've ruled and I don't know how many other ways to say it . . . .

[APPLICANT]: And, Your Honor, I'm meaning no disrespect. I have gotten to know him very well, very well.

THE COURT: Well, clearly that's what you're trying to tell the jury and that's also why it's Mr. Echols.

[APPLICANT]: I don't think there's anything wrong with caring about your client.

THE COURT: I didn't say you couldn't care about him. You just have to listen to the [c]ourt, Mr. [Applicant].

13

[APPLICANT]: I am.

THE COURT: You haven't been and everything I say you take issue with. You have been disrespectful with me.

¶ 30.  Second, the court stated that applicant claimed in front of the jury that the court was biased against him.  Applicant had stated in front of the jury that he felt an "inappropriate bias" during the trial.  Lastly, the court said that applicant acted disrespectfully when applicant received an unfavorable ruling from the court.  When explaining the ruling, the judge had asked applicant to "stop storming around" and stated that applicant had slammed his book.

¶ 31.  After the court provided these three reasons for holding applicant in contempt, applicant argued that the ruling was not justified.  Applicant explained that he was only being a zealous advocate:

> [APPLICANT]: What I would like to say is that I think that sometimes, you know, I have been doing this for several years, that I have been criticized maybe too harshly for being a zealous advocate. . . . I think sometimes people see what I'm doing in court and think that I personally am invested in it as if I'm trying to personally offend you or offend somebody. I'm not. I am really playing a role that I was taught was the right thing to do.

Before imposing a fine, the judge reminded him that lawyers can be zealous advocates and be respectful of the court.

### 5.  Misconduct in State v. Donald, 2011

¶ 32.  Applicant was held in contempt a third and fourth time while representing the defendant in State v. Donald in April 2011.  First, in the course of arguing a motion, applicant noted that he "would expect a prosecutor of [fifteen] years to know" a tenet of his argument.  The Court interrupted applicant to admonish him for personally attacking the prosecutor. Rather than apologize, applicant argued with the judge, denying that his attack was personal and invoking his "First Amendment Rights."  In the ensuing exchange, the court described applicant's conduct as follows:

14

THE COURT: [Applicant] was making argument on his [motion]. . . and said a few things that I was interjecting to simply ask [applicant] to refrain from because I thought he was out of line. At least as far as some personal attack on the assistant district attorney at this point. [Applicant] in my judgment became argumentative with the [c]ourt. I tried a second time to ask [applicant] to allow me to speak and [applicant] again in my judgment cut me off and continued to be argumentative with the [c]ourt.

¶ 33.    The transcript in the record supports the trial judge's description of events.    In response, applicant emphasized his role as a zealous advocate and the need to support his motion with argument.  He accused the court of being biased and acting as an "advocate for the State" several times and asked the judge to recuse himself.  The court then found applicant to be in contempt of the court, but did not impose a fine.

¶ 34.    Later in that same hearing, applicant was held in contempt during voir dire.  After the prosecution objected to applicant's use of an unrelated newspaper headline as a "pedagogical device" during voir dire, the judge called for a sidebar.  The judge apparently sustained the prosecution's objection and instructed applicant to proceed without it.  After returning from the sidebar, applicant stated to the potential jury members, "I'm sorry, folks. I guess I've been—It's been ruled that I can't use that.  I've been doing this ten years, and this is the most trouble I've ever had talking to a group."  The judge immediately excused the jury and held a summary contempt proceeding.  The judge said that he viewed applicant's statement as an "indictment of the [c]ourt."  In his defense, applicant claimed that his actions were permissible before stating that "it appears the [c]ourt during sidebar was acting as an advocate for the State, rather than a neutral magistrate."  He went on to say that, "the fact that you're even looking at the line of contempt shows that there's bias from the [c]ourt."

¶ 35.    The judge concluded that applicant's statement to the potential jury suggested that the court was acting improperly and thus invited disrespect toward the court.  The court emphasized applicant's repeated misbehaviors, stating that he "repeatedly, insistently, loudly fail[ed] to comply with the [c]ourt's orders," and determined that he "impair[ed] the dignity of the

15

[c]ourt and the proceedings." Accordingly, the judge held applicant in contempt and imposed a fine.

### 6. Applicant's Detention at the Milwaukee Airport

¶ 36. On his application, applicant disclosed an incident at the Milwaukee airport in 2011 when he was detained for failing to comply with airport security directives, in violation of a municipal ordinance. It appears that applicant refused to follow TSA protocols. He pled no contest and paid a fine.

### III. Analysis

¶ 37. On the basis of the above record, and additional factors noted in this analysis, this Court agrees with the Committee's conclusion that applicant's prior history shows that he does not possess the necessary moral character to be admitted to the Vermont Bar. We are primarily concerned with applicant's repeated misconduct in court and his failure to take responsibility for that misconduct. Applicant has demonstrated a pattern of disrespect and insubordination toward the courts which is "likely to result in injury to future clients, in the obstruction of the administration of justice, or in a violation of the Rules of Professional Conduct." V.R.A.B. § 11(b)(1) (Supp. 2013).

¶ 38. Taken alone, each of applicant's instances of misconduct would not lead to the same result we reach today. However, the instances described above together establish a problematic pattern of misbehavior involving different cases and different judges spanning between 2008 and 2012. See In re Bitter, 2008 VT 132, ¶ 20 ("Perhaps in isolation each of applicant's incomplete answers or failures to disclose would not raise alarms, but his repeated nondisclosure reveals a pattern of behavior that is particularly troubling . . . ."). In each of the cases described above, applicant demonstrated disrespect toward the court by willfully disregarding court orders or interrupting or inappropriately arguing with the judge about those orders; he showed very little understanding of the bounds of proper courtroom demeanor, particularly in the presence of a jury; and he frequently responded to the court's admonitions by

16

asserting that the judge was biased against him. Moreover, these incidents do not appear to be isolated. In reviewing the record relating to the specific instances at the center of this case, we saw in the transcripts multiple other instances of improper conduct in the courtroom.

¶ 39. Applicant has not shown that this pattern of insubordination will not continue in Vermont if he is admitted to practice here. He has not offered any evidence of remedial coursework, work with a mentor, counseling, or other steps he has taken to learn about proper courtroom behavior and improve his conduct. He has not shown that since the time of these incidents he has successfully practiced law within the bounds of decorum; he has not practiced law since 2012.

¶ 40. Most important, compounding applicant's disturbing history of misconduct in court, is his apparent inability to take responsibility for his actions. Although he contends that he has taken responsibility for his actions, the record reflects otherwise. He has shown a persistent lack of accountability both in his testimony at the hearing before the Committee, and more recently in his appeal letter to this Court.

¶ 41. During the hearing below, applicant stated, "I do take [responsibility] for the actions which led to the contempt and OLR charges, but in many ways I'm proud of those actions." Although applicant initially appears to take responsibility for his misconduct, the statement that he was proud of his behavior calls that claim into question.

¶ 42. Later, applicant expressed some regret for his actions in the Kostopoulos case, stating, "I am very responsible for the foolishness and stupidity of the Kostopoulos case. I should have been held in contempt." However, applicant goes on to deny the behavior behind the contempt charge, essentially rearguing the judge's conclusion that his reference to the obstacles he was facing was intended to refer to the court's rulings. His discussion of his conduct during that case focused on the poor quality of his lawyering, rather than the impropriety of his conduct.

¶ 43. In addition, applicant's discussion of his contempt charges and public reprimand during the hearing before the Committee shows his ongoing failure to acknowledge his own

misconduct. Multiple times during the hearing below, he writes off the courts' disciplinary actions as "silly" and repeatedly claims that the judges were biased and retaliating against him for exposing police and prosecutor wrongdoing. In doing so, applicant dismisses the seriousness of his actions and places the blame for his own misconduct on the courts that disciplined him instead of acknowledging that he did anything wrong.

¶ 44. More recently, applicant failed to take responsibility in his appeal letter to this Court. He again challenged the Wisconsin courts' reasons for disciplining him. And he mischaracterizes the Committee decision by stating, "[s]adly, the record shows that my advocacy on behalf of minority clients is at the heart of Vermont's decision not to admit me." Applicant's explanation of the Committee's reason for denying applicant admission to the Vermont Bar ironically only reinforces the Committee's concerns about applicant's inability to take responsibility for his actions.

¶ 45. Applicant's focus on claimed retaliation by various judges misses the point. Our decision is not based on other courts' findings of contempt or disciplinary sanctions; it is based on applicant's underlying conduct giving rise to those consequences. That conduct is evidenced by the transcripts in the record that demonstrate applicant's repeated inappropriate conduct in court. His conduct was out of bounds whether or not any judge found him in contempt, and regardless of whether any individual judge was predisposed to find him in contempt. His behavior was inappropriate whether or not he had ruffled feathers by advocating for indigent minorities. And he should have but did not learn to conform his behavior to professional standards regardless of the merits of each individual sanction imposed. Applicant should recognize this, but has not.

¶ 46. Applicant's history of misconduct and his refusal through this entire process to recognize that he acted inappropriately is concerning because it suggests that he will continue to misbehave in Vermont courts. Although the conduct that led to applicant's disciplinary sanctions does not "involve either dishonesty or lack of trustworthiness in carrying out responsibilities," they do "have a rational connection with [his] present fitness or capacity to practice law" and "relate to

the state's legitimate interests in protecting prospective clients and the system of justice." V.R.A.B. § 11(b)(1) (Supp. 2013). Applicant has shown a clear pattern of disrespecting the court when he receives an unfavorable ruling, and then accusing the court of bias for calling out that misconduct. He has continued that pattern in this very appeal. Applicant's inadequacy may be remediable, but his failure to demonstrate a genuine understanding of his problem, and to truly accept responsibility for his actions suggests that he learned little from his prior sanctions and is likely to continue to act inappropriately in Vermont courts.[5]

Affirmed.

FOR THE COURT:

_____

Associate Justice

¶ 47.    **DOOLEY, J., dissenting.**   While I acknowledge that this case is close, and the Board performed a thorough and comprehensive analysis of applicant's eligibility for admission, I would reverse the Board's decision that applicant does not have the good moral character and fitness to be admitted to the Vermont bar. Four factors primarily prompt this dissent.

¶ 48.    The first is what this case does not involve. While there are allusions to potential injuries to clients in the Board and majority decisions, this is not a case where applicant has failed to fulfill his professional obligations to his clients. Indeed, applicant represented a high volume of clients in Wisconsin with no apparent indication of client complaints. Nor, as the majority states, is there any indication that applicant is dishonest or untrustworthy. See ante, ¶ 46. Nor is there any indication that applicant is an incompetent lawyer. The cases in which applicant was found in contempt involve overzealous representation rather than inadequate representation. I

_____

    [5]  Applicant argues that the Committee erred in relying on his suspension from the Wisconsin Public Defender's and his altercation with TSA agents. We need not and do not rely on these additional instances documented in the record in reaching our own conclusion.

19

emphasize this because I believe that the traits that are not in issue are generally more important than a risk of overzealous representation.

¶ 49.   Second, the disciplinary body in Wisconsin imposed a relatively light sanction of a public reprimand for the conduct that led to the contempt citation in two of the cases.  I do not condone contemptuous conduct, but we have only a limited understanding of the culture and circumstances in which the contempt citations arose.  I am concerned that we are weighing the instances of misconduct more heavily than the evaluative body of the Wisconsin Judiciary which is much closer to the events and circumstances.

¶ 50.   Third, my review of the record indicates that applicant has taken responsibility for the inappropriate tactics he employed that led to the contempt citations but continues to assert that the unfair treatment of his clients and the circumstances with which he was confronted required passionate zealous advocacy.  This is a fine line, and in my view the difficulty in walking it has caused much of the Board's and majority's view that applicant continues to assert that what he did was proper.[6]

¶ 51.   I am more persuaded by the Washington Character and Fitness Board's conclusion that: "Mr. Brittain seems to have better insight into his past and ways to avoid such misconduct in the future.  He is maturing and accepting responsibility for his actions.  Mr. Brittain and his witnesses have indicated he will no longer return to the behavior exhibited in 2008 through 2011."  There is some risk that applicant will again engage in the conduct that caused the contempt citations, but I do not believe he is "likely" to do so, the standard for determining good moral character.  See V.R.A.B. 11(b)(1).

---

[6] The majority found that he offered no evidence of work with a mentor or counseling, and I note no such evidence.  See ante, ¶ 39.  Evidence of this type was presented to the Washington Board and relied upon by it.  The Washington Board found that applicant "seems to have better mentors who are candid with him about his behavior" and that he has taken "professional growth seminars with Dr. O'Donnell."  If this evidence is important I would remand to the Board to allow applicant to present it there.

20

¶ 52.     Finally, I am influenced by applicant's passion for justice in an area of the law where we need more zealous and skilled advocates.  In saying this, I am not endorsing professional misconduct or suggesting that we should lower character and fitness admission standards to admit passionate advocates.  I am suggesting that we not confuse passion and zealous advocacy with character flaws.

_____
Associate Justice