NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2023 VT 13

No. 22-AP-168

In re Harry Taub
(Office of Attorney Licensing)

Original Jurisdiction

Character and Fitness Committee

January Term, 2023


Thomas S. Durkin, J., Chair

Harry C. Taub, Pro Se, Albuquerque, New Mexico, Appellant.

Susanne R. Young, Attorney General, Montpelier, and Andrew D. Watts, Assistant Attorney
 General, Waterbury, for Appellee State.


PRESENT: Reiber, C.J., Eaton, Carroll, Cohen and Waples, JJ.


¶ 1. **EATON, J.** Applicant Harry Taub appeals the decision of the Vermont Board of Bar Examiners Character and Fitness Committee declining to certify applicant's good moral character and recommending denial of his application for admission to the Vermont Bar. We affirm.

¶ 2. Applicant applied for admission to the Vermont Bar in November 2020. An individual member of the Committee considered and declined to certify applicant's good moral character and fitness, prompting the Committee to convene a three-member panel for a character and fitness hearing. Applicant appeared with counsel and testified on his own behalf. Several witnesses also testified and submitted letters in support of his application. The Committee additionally considered an investigation report prepared by the National Conference of Bar

Examiners (NCBE) and related attachments, as well as documentation pertaining to applicant's numerous criminal charges and his suspension and resignation from the California Bar. Following the hearing, the Committee issued written findings and conclusions summarized as follows.

¶ 3.    Over the course of approximately five years in the 1990s, while practicing law under a license to the California Bar, applicant embezzled over $500,000 in total from various clients. When the Bar initially learned of applicant's embezzlement, it suspended his license. Applicant continued to practice law without informing his clients that he was suspended, and continued to embezzle client funds. This resulted in a criminal prosecution, conviction, prison sentence, and resignation from the California Bar. In his testimony, applicant admitted to all of these facts. The Committee commended applicant for "acknowledging and accepting his responsibility for the very serious misconduct in his past that caused direct harm to his clients." However, the Committee was troubled by applicant's explanation for this behavior—that he did not need the money and does not know why he stole it other than he felt a sense of "entitlement" to his client's funds and acted "narcissistic[ly]." The Committee did not find this explanation credible and it did not persuade them that similar behavior would not occur again. The Committee also noted that in response to Question 12 of the Character and Fitness Application, which asks whether the applicant has ever "been the subject of any charges, complaints or grievances (formal or informal) alleging that you engaged in the unauthorized practice of law, including any now pending?", applicant answered "No," which was incorrect and which directly contradicted his hearing testimony.

¶ 4.    The NCBE report noted further criminal charges of false imprisonment and multiple charges for forgery of a driver's license. Applicant did not disclose these charges on either his Vermont Bar or NCBE applications. Applicant did not explain why he failed to disclose the false imprisonment charge, and although he testified that he did not disclose the forgery charges because he knew nothing about them, the Committee did not find this explanation credible. The

2

Committee found that these failures to disclose reflected a lack of transparency and casted doubt on his honesty and integrity.

¶ 5. After being released from prison in 2002, serving the sentence related to his embezzlement, his criminal activity ceased. Applicant worked as a paralegal for several law practices. He sought mental health treatment and engaged in civic activities within his community.

¶ 6. Although the Committee looked favorably on applicant's acceptance of responsibility for his embezzlement of client funds and his efforts toward rehabilitation after being released from prison, the Committee declined to certify applicant's good moral character and fitness. It determined that the seriousness of applicant's past conduct involving theft of client funds, his failure to abide by California's licensing suspension, his dishonesty to clients, as well as his failure to disclose numerous criminal charges and the unlicensed practice of law in his Vermont Bar and NCBE applications, outweighed his rehabilitation and positive contributions. The Committee concluded that it was not convinced of applicant's honesty or integrity, or that similar incidents would not reoccur. This appeal followed.

¶ 7. Applicant argues that the Committee improperly judged his character based on the person he was decades ago instead of the person he is today. He contends that the Committee assigned too little weight to his rehabilitation and good deeds since he was released from prison in the early 2000s and relied too heavily on his behavior in the 1990s, and thereby applied the wrong legal standard. Applicant also contends that the Committee failed to make sufficient factual findings to support its decision. Finally, applicant contends that collateral estoppel precluded the Committee's decision because the matter of his character was adjudicated at a prior hearing related to eligibility for admission by transferred Uniform Bar Examination (UBE) score. We are not persuaded by these arguments and deny applicant's application for admission to the Vermont Bar for largely the same reasons that the Committee recommended the same.

¶ 8. The Vermont Constitution grants this Court regulatory authority over the practice of law in Vermont. In re Oden, 2018 VT 118, ¶ 3, 208 Vt. 642, 202 A.3d 252 (citing Vt. Const. ch. II, § 30). "The Legislature has further recognized this inherent constitutional authority by statute, providing the Court with authority to 'publish . . . rules regulating the admission of attorneys to the practice of law before the courts of th[e] State.' " In re Anderson, 2020 VT 75, ¶ 15, 213 Vt. 124, 249 A.3d 305 (quoting 4 V.S.A. § 901). Under our constitutional and legislative authority, we promulgated the Rules of Admission to the Vermont Bar, "which are intended to ensure that attorneys granted admission to practice law in Vermont meet our standards for professional competence." Oden, 2018 VT 118, ¶ 3.

¶ 9. Under our rules, "[a]n Applicant has the burden of establishing that the Applicant possesses good moral character and fitness warranting the Applicant's admission to the bar." V.R.A.B. 5(c). The Committee members are agents of this Court appointed to investigate an applicant's good moral character. In re Bitter, 2008 VT 132, ¶ 18, 185 Vt. 151, 969 A.2d 71. Through that investigation, the Committee serves "as an initial factfinder on behalf of the Court." In re Brittain, 2017 VT 31, ¶ 17, 204 Vt. 572, 169 A.3d 1295. However, our review of "the Committee's decision is not analogous to reviewing the decision of a trial court or administrative agency" because "[o]ur constitutional authority and responsibility for regulating the practice of law require that we consider the Committee's findings in the context of our own searching review of the record." Anderson, 2020 VT 75, ¶ 20 (quotation omitted). Thus, "[a]lthough we typically defer to the Committee's credibility assessments and findings, we are not bound to do so." In re Grundstein, 2018 VT 10, ¶ 23, 206 Vt. 575, 183 A.3d 574 (quotation omitted). Ultimately it is this Court, not the Committee, that "must be convinced of [an] applicant's good moral character." Bitter, 2008 VT 132, ¶ 18 (quotation omitted).

¶ 10. Contrary to applicant's suggestion, it was appropriate for the Committee to consider applicant's past behavior, even that which occurred decades ago. Our rules explicitly provide that

4

an applicant's past behavior is relevant to determining an applicant's present eligibility. Indeed, this understanding is embodied in the very definition of "Good moral character and fitness." See V.R.A.B. 16(b) (" 'Good moral character and fitness' means that the person's prior conduct reasonably demonstrates that the person presently meets the essential eligibility requirements . . . ."). The fact that significant time has passed since these crimes and that applicant has taken steps toward rehabilitating himself may diminish the weight of that evidence against him—and here, the Committee appropriately accounted for these mitigating factors—but it remains relevant. Applicant's historical behavior is particularly relevant because the crimes were committed against applicant's own legal clients and were thus directly related to his practice of law and conduct as a member of a state bar. See V.R.A.B. 16(b) (applicant must demonstrate, based on "prior conduct," that he "does not likely pose a risk to clients, the legal system, or the administration of justice"). As the Committee found and applicant does not contest, he embezzled large sums of money from his clients over the course of several years, continued this same behavior even after he was caught and his license was suspended, continued to practice law while his license was suspended, and failed to disclose to clients that he was practicing without a license. These acts demonstrate not only "a risk to clients," V.R.A.B. 16(b), but also applicant's dishonesty and lack of trustworthiness generally, see Anderson, 2020 VT 75, ¶ 27 ("The prior conduct that usually affects an applicant's good moral character involves either dishonesty or lack of trustworthiness." (quotation omitted)).

¶ 11. Beyond these circumstances, we share the Committee's concern regarding applicant's explanation for his actions. He testified that he did not need the money but took it from his clients anyway. Responding to a question about how he has grown emotionally since the 1990s, applicant testified that back then his "ego was such that [he] could believe [he] was entitled to take money" and that he "didn't have any empathetic attunement to those people." But he immediately followed that explanation by describing the almost-familial role he played in his clients' lives,

5

exemplified by one client, from whom he "took a lot of money," whose family would call him "Uncle Harry" when he went to their home. He stated that his clients viewed him as a "trusted advisor," that these kinds of close, personal relationships are the ones he wants to have with his estate-planning clients, and that he "like[s] doing that kind of work." It is difficult to imagine an attorney-client relationship much more intimate than one where the attorney visits his clients' homes and is referred to by a familial title, yet applicant concluded his response about emotional growth by stating that he takes his legal work "more personally now" than he did thirty years ago. The Committee was not satisfied with this answer, and neither are we. That applicant engendered such a deep level of trust and familial closeness with his clients makes his breach of that trust all the more extraordinary and troubling. Based on the Committee's credibility determination regarding this explanation, to which we defer, and our own independent review of the record, we are not persuaded that applicant is no longer capable of similar misconduct.

¶ 12. While the severity, length, and circumstances of applicant's thefts are troubling, "[w]e are generally more concerned with an applicant's ability to honestly and completely answer questions about their past than we are with past conduct itself." Anderson, 2020 VT 75, ¶ 27 (alterations and quotation omitted). Thus, equally or even more important than applicant's crimes is that applicant was not forthright in answering questions related to his current application to the Vermont Bar about this time period. See Bitter, 2008 VT 132, ¶ 27 ("False, misleading or evasive answers to bar application questionnaires may be grounds for a finding of lack of requisite character." (quotation omitted)). In particular, applicant did not disclose in his NCBE application any charges or reports regarding his unauthorized practice of law, and denied ever having been the subject of such a report, despite an unequivocal question seeking that information. The Committee noted that this written response conflicted directly with applicant's testimony, in which he explained that an insurance agent of one his clients "investigated and found that I was suspended,

6

found that I had never told the clients, reported me to the bar, ultimately leading to the [unauthorized practice of law] charges."

¶ 13.  Applicant also failed to disclose on his application non-client-related criminal charges, which appeared on the NCBE investigation report.  In response to a question asking whether he had ever been charged with violating any law, he answered yes and listed a series of court docket numbers.  When prompted to provide a "detailed description" of the violations, he summarized all of the cases as, "Taub taking money from clients.  Charges stemmed from those claims of clients for wrongful taking of money."  One of these docket numbers, however, identified a criminal case against applicant for false imprisonment and battery.  Although applicant admitted at the hearing that he had been charged with misdemeanors for domestic violence and false imprisonment related to the disintegration of his marriage, he did not explain why he failed to fully disclose these charges on his NCBE application.

¶ 14.  Applicant additionally failed to disclose on his NCBE application numerous charges for forgery of a driver's license/ID.  When a Committee member asked him at the hearing about these charges, he stated "I know it was a charge, but I have no idea what the forgery charge was whatsoever."  He testified further that he had "no idea" of the date when he was charged, but that to the best of his memory, "the charges were in some way all merged or amalgamated."  Indeed, according to the NCBE report, all of the forgery charges were combined or associated with each other and with grand theft charges under a single docket number.  Applicant thus revealed that he had some knowledge or memory of these charges at the time of the hearing but did not explain how or why the charges were brought.  He also did not justify his failure to list these charges on his written NCBE application.  The Committee did not find applicant's testimony on this issue credible, and we defer to that determination.

¶ 15.  Applicant's appellate briefs further undermine his credibility as to these charges. Despite having some, albeit vague, recollection of the forgery charges at the hearing, he repeatedly

7

refers to them as "alleged" charges on appeal. And although the NCBE report indicates that applicant pleaded "not guilty" to all of the forgery charges, applicant dubiously states in his reply brief that these charges were "never the subject matter of any discussion by and between the Appellant and his criminal defense lawyer . . . [and] never an issue raised during any court proceeding." These inconsistencies deepen our doubts regarding applicant's candor and trustworthiness. See Anderson, 2020 VT 75, ¶ 27 (noting that "inconsistent explanations for past conduct," including in representations to this Court, are relevant to analysis of good moral character).

¶ 16. Applicant claims that the Committee failed to consider the testimony and supporting letters of numerous witnesses in his favor, including lawyers who have employed him since his release from prison, his Rabbi, and his psychologist, as well as evidence of his volunteer work, contributions to his community, and that he repaid the clients from whom he stole money. He argues that the Committee assigned too little weight to his track record of rehabilitation and good behavior over the last twenty years. We disagree. As the Committee stated, "[applicant] should be commended for the work he has done both personally and professionally in the years since he was released from prison in 2002." But even strong evidence of rehabilitation may be overcome by an applicant's repeated lack of candor in his application for admission and proceedings before the Committee and this Court. See Bitter, 2008 VT 132, ¶ 20 ("While we agree with applicant that it is his present character that is at issue and that his criminal past is remote in time, his more recent expressions of character and trustworthiness give us pause."). Such is the case here. We have reviewed and thoroughly considered the evidence both for and against applicant in our evaluation of the record, and we reach the same conclusion as the Committee: that applicant failed to meet his burden to demonstrate his good moral character and fitness, particularly, that he "does not likely pose a risk to clients, the legal system, or the administration of justice." V.R.A.B. 16(b). Applicant's serious and long-running crimes against his clients in

8

the 1990s, his explanation for that behavior, and, most critically, the several instances of dishonesty or lack of candor related to his current application to the Vermont Bar leave us unconvinced that applicant possesses the good moral character necessary for a member of this state's bar.

¶ 17. We briefly address applicant's argument that the Committee failed to make sufficient findings to support its conclusion. Applicant cites to Anderson, 2020 VT 75, where we determined that the Committee "did not make sufficient factual findings to support its decision to certify [the] applicant's good moral character," and, after conducting our own review of the record, declined to certify the same. Id. ¶ 13. Applicant here implies that the Committee's failure to make sufficient findings is a basis for reversal or remand. We did not suggest as much in Anderson, and we need not reach that issue in this case, because the Committee's findings were sufficiently detailed and based on ample record evidence to support its ultimate decision not to certify applicant's character.

¶ 18. Applicant cites to case law from Vermont and other states to support the general proposition that an applicant should not be denied admission based upon historical misconduct where a long time has passed since any misconduct occurred and the applicant has taken responsibility for that behavior and made efforts toward rehabilitation. These cases are not squarely on point with the facts of this matter and therefore of minimal utility, but to the extent they provide any guidance, they are consistent with our analysis. In In re Capriola, 145 Vt. 245, 487 A.2d 144 (1984) (per curiam), this Court reinstated the bar membership of an individual who had been disbarred several years earlier following his conviction for embezzlement. In a terse per curiam opinion, the Court summarily concluded that the applicant had met the moral qualifications for admission based on an "extensive investigation" conducted by the Professional Conduct Board, without explaining any details of that investigation. Id. at 146-47, 487 A.2d at 145. It is therefore impossible to compare the factual record in this case to the record in Capriola. As applicant

9

emphasizes, <u>Capriola</u> does suggest that an applicant's moral character should be assessed in the present. <u>Id</u>. But this is consistent with the standards set forth in the current Admission Rules, and nowhere does <u>Capriola</u> suggest that past behavior or lack of candor in the application process are irrelevant to character.

¶ 19. Applicant cites to numerous out-of-state cases that establish moral-character standards to be applied to applicants with criminal records seeking readmission to a bar. None of these involves an applicant who failed to disclose critical information on his application or provided inconsistent or incredible explanations for past behavior. And none suggests that such facts—reflecting the applicant's present lack of trustworthiness—should be ignored. To the contrary, two of the cases that applicant relies on most heavily explicitly identify an applicant's candor in the admission filings and proceedings as a standalone factor to be considered in assessing character. <u>In re Manville</u>, 494 A.2d 1289, 1297 (D.C. 1985) (listing factors including "candor, sincerity and full disclosure in the filings and proceedings on character and fitness"); <u>In re Rosellini</u>, 739 P.2d 658, 661 (Wash. 1987) (en banc) (listing factors including "the sincerity, frankness, and truthfulness of the applicant in presenting and discussing the factors relating to his disbarment and reinstatement" (quotation omitted)). These cases thus bolster our conclusion.

¶ 20. We turn lastly to applicant's argument regarding collateral estoppel. Collateral estoppel applies when:

> (1) preclusion is asserted against one who was a party or in privity with a party in the earlier action; (2) the issue was resolved by a final judgment on the merits; (3) the issue is the same as the one raised in the later action; (4) there was a full and fair opportunity to litigate the issue in the earlier action; and (5) applying preclusion in the later action is fair.

<u>Trepanier v. Getting Organized, Inc.</u>, 155 Vt. 259, 265, 583 A.2d 583, 587 (1990). Applicant contends that the issue of his character was fully litigated at a hearing related to his eligibility for admission by transferred UBE score, which was conducted several months before the hearing in

10

this matter.  The purpose of that hearing was to assess whether applicant had demonstrated "good cause"—i.e., that his "legal education is not stale" even though more than five years had passed since applicant had completed the educational requirements, V.R.A.B. 13(d)—to allow his admission by transferred score.  Applicant's "good moral character and fitness" was not at issue.  Because the third prong of the collateral-estoppel test is not satisfied, we conclude that the doctrine does not apply here without evaluating the other elements.[*]

    <u>Affirmed</u>.

FOR THE COURT:

_____

Associate Justice

---

[*] Applicant argues for the first time in his reply brief that the State waived any argument that collateral estoppel does not apply because the Committee could have based its "good cause" determination on his past conduct, which was discussed to some extent at that hearing, but it did not do so.  We decline to consider this untimely contention.  See <u>Gallipo v. City of Rutland</u>, 2005 VT 83, ¶ 52, 178 Vt. 244, 882 A.2d 1177 (noting that issues not raised in principal brief may not be raised for first time in reply brief).

11