NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2018 VT 10

No. 2017-084

In re Robert Grundstein

Supreme Court

Original Jurisdiction

From
Character and Fitness Committee

September Term, 2017

David E. Tartter, Neal Rodar and Martha O'Connor, Panel Members

Paul S. Gillies of Tarrant, Gillies & Richardson, Montpelier, and Robert Grundstein, Pro Se, Morrisville, for Petitioner-Appellant.

Thomas J. Donovan, Jr., Attorney General, and Benjamin Battles, Solicitor General, Montpelier, for Respondent-Appellee.

PRESENT: Reiber, C.J., Skoglund, Robinson, Eaton and Carroll, JJ.

¶ 1. **ROBINSON, J.** Applicant Robert Grundstein appeals the decision of the Vermont Character and Fitness Committee declining to certify his good moral character and fitness to be admitted to practice law in Vermont. We conclude that applicant has failed to satisfy his burden of demonstrating a good moral character. Accordingly, we affirm.

¶ 2. Applicant achieved a passing score on the February 2016 Vermont bar examination. His application was forwarded to the Character and Fitness Committee, which assigned one of its members to investigate applicant's moral character and fitness. On May 9, 2016, the member reported to the Committee that he was unable to certify applicant's good moral character and fitness. The member noted that applicant offered confusing explanations for his disbarment in Washington State and his conviction for alteration of a court document. The member was also concerned that the Washington disbarment notice stated that applicant had repeatedly violated

court orders and filed meritless pleadings. A three-member panel of the Committee held a hearing on the matter on October 20, 2016. Applicant attended the hearing and was represented by counsel. In a written decision issued on January 30, 2017, the Committee declined to certify applicant's good moral character and fitness.

## I. Record Evidence

¶ 3. Applicant received a juris doctor degree from the Cleveland Marshall College of Law in 1985. After law school, he traveled and helped start a restaurant in New Hampshire. He worked as a clerk in New Mexico and unsuccessfully took the New Mexico bar examination in 1986. He then returned to the restaurant business. In 1991, he passed the Washington State bar examination and was admitted to the Washington bar. He did not practice law in Washington, instead remaining in the restaurant business. In 1994, he returned to Cleveland, Ohio to care for his parents. He left Ohio in 2002, moving first to New Hampshire and then settling in Vermont. He has lived in Vermont since 2003 and has supported himself in real estate development. He testified that he never "really" practiced law, although when he lived in Washington he helped a local attorney draft some documents.

¶ 4. On his Vermont bar application, applicant disclosed that he had two criminal convictions: a 2002 conviction for improper storage of a firearm and a 2008 conviction for alteration of a court document. Both convictions were in Ohio.

¶ 5. According to applicant, the 2002 case began when his car was towed for a parking violation. The police went through the car and found his .22 pistol in the glove compartment. He was charged and found guilty of improper storage of a firearm and sentenced to two years' probation with a condition that he not possess any firearms.

¶ 6. Applicant testified that despite this condition he returned to Vermont and attempted to purchase a new firearm. He claimed that the probation was "unsupervised" and that the Ohio court administrator told him that he could ignore the probation conditions. Applicant's request to purchase a gun was initially denied because the Federal Bureau of Investigation (FBI) could not

2

determine whether the Ohio gun conviction was a felony or a misdemeanor. When applicant requested a copy of the police report from the Ohio court, he noticed that the report listed the statute under which he was convicted, but did not include the specific subsection. He therefore wrote in the subsection on the police report using different-colored ink and sent it to the FBI, along with a letter stating that the Ohio court "forgot" the subsection, but "it doesn't matter because everything under [that statute] is a misdemeanor." The FBI permitted him to purchase a gun.

¶ 7.    Applicant then received a letter from the Ohio court stating that he had violated his probation by obtaining a gun and altering a court document. He responded that the Ohio court had no jurisdiction in Vermont, and that he had not altered a court document.

¶ 8.    The docket entries for the case indicate that the Ohio court issued a warrant for applicant's arrest in July 2003 after applicant failed to appear at a probation violation hearing. In October 2004, applicant "entered admission of probation violation charge of altering a court document and submitting the altered court document to the Federal Bureau of Investigation (FBI) to obtain a firearm in violation of a condition of probation." The docket entries also state that applicant was found guilty of contempt of court in violation of Ohio Revised Code 2705.05. His probation was extended until 2007 and he was again prohibited from owning or possessing firearms. The docket entries state that applicant had "repeatedly, despite admonition by court, sent written communication directly to the undersigned judge." The court ordered that all communications be made through applicant's attorney with service upon the prosecutor. Applicant subsequently filed numerous motions challenging the court's rulings, which were denied. His probation eventually expired in April 2007.

¶ 9.    In 2008, applicant was convicted on a new charge of altering a court document. Applicant reported on his bar application that he pleaded guilty in October 2008, that the case was filed in the Cuyahoga County Court of Common Pleas, and the case number was CR-07-500545-A. The Committee requested information relating to that case number. It received a case summary indicating that applicant was charged in 2007 with tampering with records, but the jury returned a

3

"no bill," meaning that they refused to indict applicant on this charge. Under a section labeled "Other Cases," the summary lists another case number, CR-07-501796-A. This suggests that applicant actually entered his guilty plea in the latter case. The precise charge in that case is unclear from the record.

¶ 10.    Applicant testified before the Committee that he did not know what document he was accused of altering in the 2008 case. He claimed that the prosecutor was known for bringing cases with no evidence, and was later asked to resign after an FBI raid. He pleaded guilty, but he could not remember the charge. He claimed that he never found out what the allegation against him was, but that he guessed it was related to his attempt to obtain a new gun after being convicted of improper storage of a firearm in Ohio. Applicant claimed that the docket entries in the case were falsified by the docket clerk, who later went to jail. He did not provide these docket entries to the Committee.

¶ 11.    Applicant contended that he was the target of retaliation by an Ohio judge who ruled against him in an unrelated civil case in April 2007. Applicant sued his condominium association on behalf of himself and other condominium owners, alleging that the association overcharged the owners for a roof. According to him, the judge was unprepared, didn't know the law, and did a "terrible job." After the court entered judgment in favor of the association, applicant stood on the courthouse steps and passed out an "editorial" criticizing the judge. The editorial stated that applicant, while in the courtroom, "felt as if I was standing before an emotionally ill person pursuing his mania at the expense of professional standards." Applicant did not appeal the decision, however, because he "didn't think it would do any good." According to applicant, a few months after he distributed his editorial, he was charged with altering a court document.

¶ 12.    Meanwhile, in 2006 applicant filed suit in Washington state court against his brother, whom he accused of stealing over $100,000 from their mother's accounts. During the course of that litigation, he noticed that his brother's attorney was being paid from their mother's trust, which he felt was improper. He filed a complaint against the attorney with the Washington

4

State Bar Association (WSBA). The WSBA refused to do anything, so he resubmitted his complaint. "[T]he next thing you know," in September 2010 there was a formal complaint against him filed with the WSBA.

¶ 13. According to applicant, the complaint alleged that he had altered a court document and made frivolous filings. He called the WSBA and said "I'm a wonderful person. I exposed corruption in Ohio. You guys should give me a medal. I did what no one else would do." He filed suit in federal court seeking to enjoin the WSBA hearing. The federal court, in a "terrible ruling," abstained. Applicant testified that he was unable to find an attorney to represent him before the WSBA, and that a local attorney told him "it doesn't matter how bad their case is and how good yours is, you're going to get hammered."

¶ 14. Applicant represented himself at the WSBA disciplinary hearing, which took place in September 2011. He testified that he provided over forty exculpatory exhibits to the WSBA at the disciplinary hearing. When he received the report summarizing the hearing, however, none of his exhibits had been admitted into the record. He claimed that "they stole all my evidence." He also claimed that the WSBA improperly modified the disciplinary complaint at the hearing to request disbarment instead of a lesser form of discipline.

¶ 15. In June 2012, applicant was disbarred. The WSBA Discipline Notice stated that applicant:

> Falsified a document in connection with obtaining a gun permit and falsified records of criminal convictions;
>
> Filed frivolous lawsuits and pleadings related to or stemming from his criminal convictions in Ohio;
>
> Filed frivolous lawsuits and pleadings related to or stemming from his extradition from Vermont to Ohio in state and/or federal court;
>
> Filed motions, claims, appeals, and/or writs without foundation in connection with one or more civil cases;
>
> Disregarded court orders in one or more civil cases;
>
> Filed frivolous pleadings and/or appeals in one or more civil cases;

5

> Made false statements to the court and/or asserted frivolous claims or arguments in one or more civil cases;

> Repeatedly violated court orders or rules and/or repeatedly filed meritless pleadings, motions, and appeals and filed the same motions multiple times in one or more civil cases.

The discipline notice also stated that applicant "testified at his disciplinary hearing that he will continue to file lawsuits and to disobey court orders if he believes they are unconstitutional, and will continue to file lawsuits until he believes his claims have been heard."

¶ 16.    Applicant claimed that he attempted to appeal, but the Washington Supreme Court refused to hear his case. He asserted that the court clerk refused to give his motions to the justices. He filed another suit in federal court to enjoin the disbarment, which the court dismissed on the basis of immunity.

¶ 17.    Applicant did not provide a copy of the disciplinary complaint, the WSBA's official decision, or the Washington Supreme Court decision on his appeal to the Character and Fitness Committee. He also did not provide a complete copy of the transcript of the WSBA hearing, despite promising to do so at the hearing. He did provide a few pages of the transcript in which the parties refer to applicant's exhibits.[1]

¶ 18.    Applicant provided numerous other documents to the Committee in support of his application, very few of which were related to his own cases. Some were newspaper articles about individuals formerly associated with the Ohio police and judiciary who had been charged with various crimes. Others were documents criticizing the WSBA and its practices. These documents were presumably intended to support applicant's claims that he was the innocent victim of multiple

---

[1] The materials applicant provided to the Committee include a letter from the WSBA clerk stating that she was returning to applicant the exhibits he sent to the WSBA because they "were never submitted by the Hearing Officer to be part of the record. . . . I filed the exhibits that were admitted." Applicant vigorously challenges the assertion that the exhibits were never admitted into evidence as part of the record. The transcript pages he provided do not show that the exhibits were admitted; they simply refer to the existence of the exhibits. Applicant also did not explain what these exhibits were or why they were important.

6

corrupt institutions in Ohio and then in Washington. Applicant testified that he wrote a book exposing the corruption in the Ohio judicial system titled "Bad Minds, High Places: The FBI Raids on Cleveland and America's Archipelago of Legal Failure." The Committee requested that applicant provide it with a copy, but applicant did not do so; instead, he submitted a picture of the book's cover.

¶ 19. Applicant provided positive written references from three attorneys, a friend, and an Ohio journalist.[2] A Vermont attorney testified at the Committee hearing that he had known applicant for over forty years and had a high opinion of applicant's character. A Washington attorney testified by telephone at the hearing that he had never met applicant but they had spoken frequently. He believed that applicant's disbarment was retaliation for filing a grievance against his brother's attorney, and stated that it was "pretty common" for evidence to go missing from WSBA cases and for complaints to be amended at the hearing. He believed that the findings of fact from applicant's case were difficult to obtain because "they don't want people to read it" because "they probably know it's ridiculous." He suggested that the internet search results for applicant's name had been manipulated by the WSBA.

II. Character and Fitness Committee Decision

¶ 20. In considering applicant's moral character, the Committee focused primarily on two clusters of concern: one involving applicant's Ohio conviction for altering a court document and the other relating to his subsequent disbarment in Washington. The Committee also expressed concerns about applicant's capacity to practice law based upon his conduct during the proceedings below.

---

[2] Applicant argues that the Committee erred by failing to take note of his testimony that Vermont's bar counsel had authorized him to say that bar counsel had no objection to applicant's admission. We see no error. The Committee was not required to include every assertion by applicant in its findings, particularly where the assertion in question was a hearsay statement attributed to a third party and unsupported by any other evidence. The Committee considered applicant's multiple positive written references and the testimony of the two attorneys who appeared at the hearing in support of applicant.

7

¶ 21. With respect to the Ohio conviction and the Washington disbarment, the Committee noted that applicant's response to the Committee's concerns was to deny any wrongdoing and to attack the legitimacy of the underlying proceedings and institutions. Regarding the conviction, the Committee found that applicant was unable to give a clear and coherent explanation of the nature of the charge and underlying conduct, and therefore had failed to meet his burden of proving his good moral character in light of the undisputed fact of the conviction. Similarly, the only document the Committee had before it concerning applicant's Washington disbarment was the WSBA disciplinary notice, which recited a litany of misconduct including frivolous lawsuits and pleadings and disregard of court orders. The few transcript pages provided by applicant from the WSBA hearing did not show that his disbarment was unwarranted. The Committee found that the other documents provided to it by applicant did not concern the merits of the conviction and disbarment, and did not demonstrate applicant's good moral character or fitness.

¶ 22. The Committee further determined that applicant's conduct throughout the character and fitness proceedings showed that he was unfit to practice law. Although there was no evidence that applicant was suffering from a health condition, the Committee found that he was unable to focus on the issues of concern to the tribunal or to provide reliable, relevant evidence. He also appeared not to fully understand his own legal situation, as evidenced by his inability to explain the charge to which he pleaded guilty. He did not provide information that was obviously important to the Committee, such as the records of the disbarment proceeding in Washington State that he promised to provide. The Committee concluded based on this conduct that applicant was presently unfit to practice law. Applicant timely appealed to this Court.

III. Standard of Review

¶ 23. In appeals from the Character and Fitness Committee, this Court "may take any action consistent with its constitutional authority." V.R.A.B. 18(d) (Supp. 2017); see also

8

V.R.A.B. § 11(i) (Supp. 2012).[3] Because the Vermont Constitution gives this Court the unique responsibility to regulate the practice of law within this State, we have plenary authority to review the findings and conclusions of the Committee. In re Brittain, 2017 VT 31, ¶ 17, __Vt.__, 169 A.3d 1295; Vt. Const. ch. II, § 30. Although we typically defer to the Committee's credibility assessments and findings, "we are not bound to do so. Our constitutional authority and responsibility for regulating the practice of law require that we consider the Committee's findings in the context of our own searching review of the record." Brittain, 2017 VT 31, ¶ 17. "[U]ltimately, it is this Court that must be convinced of the applicant's good moral character and fitness." In re Bitter, 2008 VT 132, ¶ 18, 185 Vt. 151, 969 A.2d 71 (quotation omitted).

## IV. Analysis

¶ 24. On appeal, applicant argues that (1) he should be certified for character and fitness on the basis of estoppel or laches because he was allowed to sit for the bar exam in 2014 and again in February 2016, before the character and fitness determination; (2) the Committee erred in finding him unfit because there was no evidence that he has a health condition that manifests in conduct that is likely to pose a substantial risk of harm to the public or legal system; (3) the record relating to the Ohio matters and the Washington Bar disbarment does not support the Committee's determination; and (4) the Committee erred in considering the way in which applicant conducted himself through this proceeding because he established his competence by passing the bar exam and he was not on notice that his conduct would be subject to scrutiny as part of the character and

---

[3] The Vermont Rules of Admission to the Bar were reorganized and replaced with new Rules 1-29 while applicant's bar application was pending. We agree with applicant that his case is controlled by the rules in effect at the time he filed his application in 2015, and will therefore cite to the older version of the rules in this opinion. We emphasize that the outcome of this case would be the same under the new version of the rules, which are cited where appropriate.

While this appeal was pending, applicant sent five copies of a document containing his proposed changes to the character and fitness rules to a member of this Court. The documents have been forwarded to the Board of Bar Examiners and we have not considered them in the resolution of this appeal.

fitness evaluation.[4]   In addition, in his brief, as well as in a series of pre- and post-argument motions, applicant objects to our considering matters of public record cited by the State that were not in the case record considered by the Committee, offers explanations and clarifications concerning those matters, and seeks to supplement the record with various arguments, explanations and assertions.  We consider these arguments in turn.

## A.  Estoppel and Laches Arguments

¶ 25.    We reject applicant's argument that the Committee was equitably estopped from inquiring into his character and fitness after applicant was permitted to take the bar examination in February 2016.[5]  Applicant argues that pursuant to this Court's decision in In re Monaghan, 126 Vt. 53, 222 A.2d 665 (1966), the character and fitness investigation must take place before the examination.  In Monaghan, we described the certification of an applicant's good moral character and fitness to practice law as "a condition precedent to the privilege of taking the bar examinations."[6]  Id. at 64.  By permitting applicant to take the examination, applicant claims, the Board of Bar Examiners effectively conceded his good moral character and fitness and is now

---

[4]   Applicant also alleges various constitutional defects in the bar admission process, including that: Vermont's character and fitness standard is unconstitutionally vague; the character and fitness review process violates the Equal Protection Clause, the Privileges and Immunities Clause, and the Fifth Amendment; and the review was not conducted by an impartial decision maker.  Because these issues are inadequately briefed, we decline to address them.  See Concord Gen. Mut. Ins. Co. v. Gritman, 2016 VT 45, ¶ 29 n.3, 202 Vt. 155, 146 A.3d 882 (explaining that Court will not review constitutional claims that are inadequately briefed).

[5]   After oral argument in this appeal, applicant filed a request for extraordinary relief under V.R.A.P. 21 claiming that the Committee "lacked jurisdiction" to consider his character and fitness once he took and passed the bar examination.  Applicant's request is denied.  Relief under V.R.A.P. 21 is available only "where there is no adequate remedy under these rules or by appeal."  Applicant's remedy was through appeal, a right which he has exercised.  The argument contained in his petition is essentially the same argument he presented in his brief, and is rejected for the same reasons, described below.

[6]   The former rules contained similar language.  See V.R.A.B. § 9(f)(2) (Supp. 2012) ("Completion of the educational and application requirements provided in these rules is a condition precedent for eligibility to take a written examination . . . .").  The current rules make clear that the character and fitness investigation may take place after the examination.  V.R.A.B. 20(a) (Supp. 2017) (explaining that applicant must satisfy all requirements within two years of date of examination).

estopped from denying it. We conclude that applicant has not made the particular showing required to support estoppel against the government.

¶ 26. To establish a claim of estoppel, a party must demonstrate that (1) the party to be estopped knew the facts; (2) the party to be estopped intended that its conduct would be acted upon; (3) the party seeking estoppel was "ignorant of the true facts"; and (4) the party seeking estoppel relied to his or her own detriment upon the conduct of the party to be estopped. In re Lyon, 2005 VT 63, ¶ 17, 178 Vt. 232, 882 A.2d 1143. In addition, estoppel against the government "is appropriate only when the injustice that would ensue from a failure to find an estoppel sufficiently outweighs any effect upon public interest or policy that would result from estopping the government in a particular case." In re Letourneau, 168 Vt. 539, 547, 726 A.2d 31, 37 (1998) (quotation omitted).

¶ 27. Even if applicant established the general elements of estoppel, this case does not involve the sort of exceptional circumstances that would justify estopping the State. See Lyon, 2005 VT 63, ¶ 23 (noting that this Court has refused to estop government where isolated action resulted in detrimental reliance by single party). Any injustice to applicant is outweighed by the significant public interest in ensuring that candidates for admission to the Vermont bar possess good moral character and fitness. See V.R.A.B. § 5(a) (2009) ("The public interest is best served and protected and the integrity of the Bar of the Supreme Court is best maintained when applicants for admission are fairly, impartially, and thoroughly investigated as to their moral character and fitness . . . ."); see also V.R.A.B. 1 (Supp. 2017). The purpose of this requirement is to protect prospective clients and the justice system. V.R.A.B. § 11(b)(1), (2) (Supp. 2012). While we recognize that applicant may have invested a significant amount of time and money in taking the bar examination, the public interest in conducting a thorough investigation of an applicant's character and fitness is of paramount concern. We therefore conclude that the fact that applicant

11

was permitted to take the examination did not estop the Committee from continuing its investigation.[7]

## B. Fitness

¶ 28. We agree with applicant that "fitness" is not the best rubric for evaluating the significant concerns raised by his application, and focus our own analysis of the application on applicant's "character." The Vermont Rules of Admission to the Bar require each applicant to possess good moral character and fitness. V.R.A.B. § 11(a) (Supp. 2012); V.R.A.B. 5(c) (Supp. 2017). The version of the character and fitness rule applicable to this case defines good moral character as "a functional assessment," the purpose of which is "to exclude from the practice of law those persons possessing character traits that are likely to result in injury to future clients, in the obstruction of the administration of justice, or in a violation of the Rules of Professional Conduct." V.R.A.B. § 11(b)(1) (Supp. 2012). Typically, such character traits "involve either dishonesty or lack of trustworthiness in carrying out responsibilities," but other traits may also be relevant if they have "a rational connection with the applicant's present fitness or capacity to practice law" and "the state's legitimate interests in protecting prospective clients and the system of justice." Id. "Fitness," on the other hand, is defined as "the assessment of health as it affects the competence of an applicant." V.R.A.B. § 11(b)(2) (Supp. 2012). Significantly, the applicant has the burden of proving his or her good moral character and fitness. V.R.A.B. § 11(c) (Supp. 2012); see also V.R.A.B. 5(c), 16(c) (Supp. 2017).

¶ 29. Because there is no evidence in the record that applicant has any health condition affecting his ability to practice law, a denial of his application on the basis of "unfitness" is not supported in the record. By its plain terms, the rule requires a determination of lack of fitness to

---

[7] We also reject applicant's related argument that the Committee was barred from investigating him in 2016 because they had a prior opportunity to do so when he applied to the bar in 2014. Applicant failed the 2014 examination and was ineligible for admission. V.R.A.B. § 9(e) (2009) (requiring petition for admission to be refiled if applicant does not receive passing grade on examination). The Committee therefore properly discontinued its character and fitness investigation at that time.

be related to a health condition.  V.R.A.B. § 11(b)(2) (Supp. 2012); see also V.R.A.B. 16(b)(2) (Supp. 2017).  The Committee reasoned in its decision below that in In re Hirsch, we held that the "applicant's conduct, wholly apart from his mental health history or status, demonstrated his lack of fitness."  2014 VT 28, ¶ 7, 196 Vt. 170, 95 A.3d 412.  However, in Hirsch, the applicant had a documented mental illness that manifested itself in conduct that was likely to be harmful to clients, courts, and the profession.  The above-quoted language was intended to make clear that it was the conduct resulting from the applicant's illness, not the illness itself, that made the applicant unfit to practice law.  Id.  In other words, our decision to deny the applicant admission was not based on the fact that he had a mental illness, but on findings that his illness led to specific behaviors that rendered him unable to make proper presentations of fact or law on behalf of a client or to focus on the client's needs.  Id. ¶ 10.  Here, applicant was not alleged to have any health condition affecting his ability to practice law, and the Committee did not find evidence of any such condition.  While we agree that applicant's conduct before the Committee and this Court calls into question his ability to effectively represent clients, it was improper for the Committee to find a lack of fitness in the absence of any evidence that his questionable behaviors were caused by or related to a health condition.  See V.R.A.B. § 11(b)(2) (Supp. 2012); V.R.A.B. 16(b)(2) (Supp. 2017).

¶ 30.  Rather, we conclude that the various serious concerns this application raises are best analyzed as aspects of "character."  As set forth more fully below, our concerns arise from "a functional assessment" of applicant's history and his conduct and candor in these proceedings, and its likely impact on future clients, the administration of justice, or applicant's compliance with the Rules of Professional Conduct.  V.R.A.B. § 11(b)(1) (Supp. 2012).

## C.  The Ohio and Washington Matters

¶ 31.  Focusing primarily on the questions arising from applicant's convictions in Ohio and his disbarment in Washington, the record discloses ample evidence supporting the Committee's conclusion that applicant had not met his burden of demonstrating good moral character.

¶ 32. We emphasize that applicant bears the burden of establishing his good moral character. V.R.A.B. § 11(c) (Supp. 2012); see also V.R.A.B. 5(c), 16(c) (Supp. 2017). To the extent that he has information that would dispel the questions and concerns raised by the Committee, and now this Court, it is applicant's burden to present that information to the Committee.

¶ 33. Our primary concern is applicant's "evident lack of candor" about his past. Bitter, 2008 VT 132, ¶ 20. Applicant's 2008 conviction in Ohio for alteration of a court document and his 2012 disbarment in Washington do not necessarily compel a determination that he presently lacks good moral character. But applicant's vague and incomplete answers to questions regarding the conviction and disbarment, together with his failure to provide complete information in connection with his bar application and his false statements that he has never been held in contempt, "demonstrate a pattern short of complete honesty." Id. Moreover, his tendency to describe actions taken against him as products of corrupt conspiracies by multiple actors and institutions, coupled with the absence of any evidence to support his claims, raises red flags that applicant has not satisfactorily addressed. See Brittain, 2017 VT 31, ¶ 40 ("Most important, compounding applicant's disturbing history of misconduct in court, is his apparent inability to take responsibility for his actions.")

¶ 34. Applicant's shifting and evasive responses relating to his 2008 conviction for alteration of a court document suggest a troubling lack of candor. Applicant argues that this conviction, which was based on events alleged to have occurred in 2003, is too remote in time to be relevant to his present character. Applicant provided little information relating to this conviction, and the information he did provide was incomplete. He did not provide the correct case number associated with the conviction on his bar application. He offered vague and conflicting explanations about the charge and plea. He claimed in his appellate brief that he never committed a crime involving alteration of a court document, and argued that he was the victim of a corrupt judicial system and retaliation by a judge. He has focused much of his energy on appeal

14

to highlighting his belief that myriad actors in the Cuyahoga County political and judicial system are generally corrupt. Yet the record shows that applicant apparently pleaded guilty to a criminal charge involving alteration of a court document. While the conviction by itself would not necessarily prevent a determination of current good moral character, applicant's evasive and incomplete answers to questions regarding the conviction call into question his present truthfulness. See Bitter, 2008 VT 132, ¶ 20 ("Although willing to accept applicant's rehabilitation since his past criminal infractions, we cannot ignore applicant's seemingly chronic inability to honestly and completely answer questions about his past.").

¶ 35. Applicant's unclear and incomplete explanation of his Washington disbarment gives us further reason for concern. Applicant claimed that he was wrongfully disbarred in retaliation for filing a complaint against another attorney. He believed that he was the victim of a vendetta by the Washington trusts and estates bar. He claimed that he presented exculpatory evidence to the WSBA, which they "stole" from him, and that the Washington Supreme Court refused to hear his appeal. However, he failed to provide critical information that would allow the Committee to assess the validity of these claims, such as his complaint to the WSBA, the formal disciplinary complaint against him, the WSBA decision, or any Washington Supreme Court decision. Applicant argued that the transcript of the WSBA hearing would corroborate his version of events, stating, "[e]verything that occurred there is in the transcript. I have a disk." He promised to provide the transcript to the Committee, but then did not do so, making it impossible for the Committee to assess the credibility of his description of the hearing. He did not even proffer the disk.[8] The few transcript pages he did provide do not demonstrate that the WSBA proceeding was fundamentally flawed or that the WSBA's decision lacked evidentiary support.

---

[8] Applicant stated in his brief that he provided what he had, which was "less than he thought." He said he contacted the transcription service, which informed him that the transcript would be quite expensive. He argues that he could not afford the transcript, and that it was not his duty to do the work of the Committee, which should have ordered the transcript if it wanted. We reject this argument. As noted above, the rule is clear that applicant has the burden of proving his character and fitness. V.R.A.B. § 11(c) (Supp. 2012).

¶ 36. Moreover, applicant utterly failed to explain the allegations in the WSBA disciplinary notice that he had repeatedly filed frivolous lawsuits and pleadings and disregarded court orders. Again, in the face of these allegations, and the fact of his subsequent disbarment in Washington, applicant bore the burden of providing the necessary information to enable the Committee to evaluate these allegations. Applicant's self-serving explanations and accusations against various individuals and entities in Washington are insufficient to meet his burden.

D. Applicant's Conduct in Proceedings Before the Committee and this Court

¶ 37. Applicant's conduct in these proceedings is not irrelevant to our analysis, although the above considerations are sufficient to support our affirmance of the Committee's refusal to certify his good character and fitness. Applicant's conduct on appeal reinforces the Committee's conclusion that his conduct in the proceedings below demonstrates that he would not be capable of providing adequate representation to clients. Two aspects of his conduct are particularly concerning. First, both before the Committee and on appeal, he has shown a lack of candor not only with respect to the Ohio and Washington situations, but also with respect to other relevant matters. Second, he has shown an inability to focus on the legally relevant issues, to provide reliable, relevant evidence, and to adhere to basic litigation procedures.

¶ 38. Applicant's apparent lack of candor is most evident in the discrepancy between the claims in his application for admission to the bar and public records that belie those claims. Applicant failed to disclose on his bar application the existence of a host of cases in which he was a litigant. The application for admission asked, "Have you ever been a named party to any civil action? . . . If yes, complete a separate FORM 3 for each action." Applicant was therefore required to provide the Committee with information regarding every civil case in which he was a named party, with no restrictions as to the age of the case. He attached one Form 3 describing a Vermont partition action, and attached a separate list of twelve civil actions in which he had been a named party in Vermont and Washington. He completely omitted any mention of the numerous civil cases he filed in Ohio, identified in the State's appeal brief. These included actions seeking writs

16

of prohibition and mandamus against the judge overseeing his improper storage of a firearm case, multiple suits against an Ohio auction company and its manager, whom he alleged owed his mother money for selling certain items from his father's estate, as well as actions against the judge involved in that case, the Ohio Eighth Circuit Court of Appeals, and the State of Ohio. Applicant also omitted from his application numerous other Washington and Vermont actions in which he was a named party. Perhaps not coincidentally, some of the cases applicant failed to mention are the cases in which he was found to have filed frivolous pleadings and disregarded court orders.[9]

¶ 39. We also find troubling applicant's repeated assertions before the Committee and in his appellate brief that he had had no contempt judgments against him, given the record evidence to the contrary. In 2010, this Court affirmed the superior court's order holding applicant in contempt for his failure to comply with a court order directing him to vacate real property that his siblings were attempting to sell. Levin v. Grundstein, No. 2009-254, 2010 WL 1266673, at *1 (Vt. Apr. 1, 2010) (unpub. mem.), https://www.vermontjudiciary.org/sites/default/files/documents/eo09-254.pdf [https://perma.cc/8G3G-JUDJ]. The record of his 2002 Ohio firearms conviction shows that he was found guilty of contempt in that case for failing to attend a hearing. While these events occurred some time ago, applicant's failure to admit honestly that he had been found in contempt by at least two courts is another demonstration of his present lack of candor before the Committee and this Court.[10]

___

[9] In one of his many post-argument motions, applicant asserted that he had submitted "5 pages of supplemental civil cases" in his NCBE form. This assertion is not supported by the record, and applicant has made no effort to provide the Committee or this Court with a copy of the claimed five pages of supplemental civil cases.

[10] For these reasons, we disagree with the Committee's statements that applicant's "testimony at the hearing was candid," that he had been "entirely open" with the Committee, and that "other than the lingering, unresolved questions [regarding his conviction and disbarment], the Board does not have reason to doubt Mr. Grundstein's honesty, ethics, or truthfulness." Applicant's omissions from his bar application and his false assertions that he has never been held in contempt give us significant doubts about his truthfulness.

These doubts are further reinforced by applicant's assertion in his reply brief that he never committed malicious prosecution and "was never charged with this or had to litigate it in a

¶ 40.   "False, misleading or evasive answers to bar application questionnaires may be grounds for a finding of lack of requisite character and fitness." Bitter, 2008 VT 32, ¶ 27 (quoting In re Beasley, 252 S.E.2d 615, 617 (Ga. 1979)).  Applicant's incomplete and evasive answers to the bar application questions, failure to provide complete information to the Committee at the hearing or afterward, and false assertions regarding his history of contempt of court, "do not give us confidence that applicant understands the importance of honesty or the gravity of his behavior." Id. ¶ 26.

¶ 41.   Applicant's inability to present a coherent case is also apparent from his conduct on appeal.  Applicant wisely retained counsel to present oral argument on his behalf.  However, following the September 12, 2017 oral argument, he asked his counsel to withdraw, and he proceeded to barrage the Court with a series of post-argument motions on September 13, September 18, September 20, September 22, October 16, and October 26.  These serial motions, which are largely repetitious of applicant's briefs and pre-argument motions, contained multiple assertions by applicant directed to "correcting the fact record," repeated assertions that the Ohio situation was a result of corruption in the Ohio legal system, an explanation that the Ohio finding that he was a "vexatious litigator" had been purged,[11] and objections to consideration of the various publicly available court decisions cited by the State.  Applicant's claims throughout these motions are generally unsupported by citations to the record, and the only additional documentation he sought to add to the record involved generalized corruption in Cuyahoga County, Ohio political

---

hearing."  While the character and fitness investigation was pending, applicant was held to have committed malicious prosecution by a Vermont trial court, a ruling this Court recently affirmed. Grundstein v. Levin, No. 2016-242, 2017 WL 571272 (Vt. Feb. 9, 2017), https:// www.vermontjudiciary.org/sites/default/files/documents/eo16-242.pdf [https://perma.cc/69Q7-NZZJ].  Our decision was entered after the Committee decided applicant's case, and we do not rely upon it in deciding this appeal.  However, we find it concerning that applicant continues to deny the fact of the ruling.

[11]   The State has acknowledged that applicant's name no longer appears on the Ohio Supreme Court's "vexatious litigator" web site, and that the decision finding him to be a vexatious litigator is no longer accessible through that web site.

and judicial systems—information that has little to no bearing on the issues in this appeal.[12]  Our determination does not rest on this fact, but we note that the Committee's recommendation that applicant clerk for an attorney if he plans to reapply for admission, in the hope that that will help him present a coherent case for his own admission in the future, was a reasonable suggestion.[13]

### E.  Matters of Public Record Not Included in the Record Below

¶ 42.    Although as noted above, supra ¶ 38, our decision does not depend on the publicly reported decisions cited by the State but not included in the record before the Committee, we reject applicant's claim that it is inappropriate for this Court to consider those decisions—at least for the limited purposes for which we have done so.[14]

¶ 43.    The State submitted with its brief numerous publicly reported decisions by Ohio, Washington, and Vermont courts in cases that applicant neglected to mention in his bar application or to the Committee.  These decisions suggest that as recently as 2015, federal and state courts in both Ohio and Washington determined that applicant had engaged in frivolous litigation and ordered him not to file further pleadings.  See, e.g., Grundstein v. Ferguson, No. C14-1356RSL, 2015 WL 1965349, at *3 (W.D. Wash. May 1, 2015) (dismissing applicant's claims as frivolous and ruling that any new cases would be reviewed "to determine whether good cause exists to permit the action to proceed in light of the claims raised therein and Mr. Grundstein's past litigation abuses"); Grundstein v. eWolf's Corp., 2015-Ohio-2163, ¶ 13, 2015 WL 3540612 (Ct. App. 2015) (dismissing appeal as "another attempt by Grundstein to relitigate the final judgment declaring him

---

[12] Most of these post-argument motions do not seek specific action by the Court apart from our decision on the merits of applicant's appeal.  Accordingly, there is nothing to grant or deny beyond the conclusions set forth in this decision.

[13] Applicant objects to the Committee's recommendation on this point, arguing that he has already participated in a clerkship under the rules of admission.  He misapprehends the point of the Committee's suggestion, which was not to impose an additional requirement as a condition of admission but, rather, was to encourage applicant to take steps that might enable him to present a more coherent case in the future, for his own benefit as well as that of prospective clients.

[14] For this reason, applicant's motion to strike the portions of the State's brief that refer to the publicly reported decisions is denied.

a vexatious litigator"); <u>Grundstein v. Grundstein</u>, 162 Wash. App. 1059, 2011 WL 3055381, at \*4 (Ct. App. 2011) (ordering applicant to pay opposing party's attorney's fees for frivolous appeal). As noted above, the docket entries from applicant's 2002 firearms conviction also show that applicant was cautioned for failing to follow the court's order that he refrain from filing further pleadings while he was represented by counsel.

¶ 44. This Court has plenary authority under the Vermont Constitution to review applications for attorney admission and is not bound by the findings of the Committee. See <u>Brittain</u>, 2017 VT 31, ¶ 17. In light of this "broadly nondeferential standard of review," <u>id</u>., we find it appropriate to take judicial notice of adjudicative facts contained in the public decisions from courts in other jurisdictions that were submitted by appellee. See V.R.E. 201(f) (providing that court may take judicial notice of adjudicative facts "at any stage of the proceeding"); see also <u>Matter of Ronwin</u>, 680 P.2d 107, 110 (Ariz. 1983) (explaining that because high court has ultimate responsibility for admitting candidates for practice of law, court is not limited by findings below and may take judicial notice of adjudicative facts on appeal).

¶ 45. Moreover, our use of these decisions is limited: we take no position on the underlying merits of these rulings. They may be wrong, and applicant may have sound explanations for his conduct in each and every case. As noted above, what is most significant about these decisions for the purpose of our analysis is the fact that applicant failed to disclose many of the cases throughout this process—even though we suspect that at least some of them were the subject of scrutiny in the Washington disbarment proceeding about which applicant failed to provide adequate information. See <u>In re Chalupowski</u>, 41 N.E.3d 51, 54 (Mass. 2015) (denying bar admission to applicant who failed to disclose involvement in numerous lawsuits and filed multiple frivolous claims against attorneys and court personnel in response to adverse judgments; applicant's conduct demonstrated lack of candor and lack of respect for legal system). And if applicant does reapply for admission, he will need to be far more transparent about these various cases.

¶ 46. Nor does our consideration of these decisions on appeal violate applicant's due process rights to know the charges against him and to respond to adverse evidence. See In re Monaghan, 126 Vt. 53, 56, 222 A.2d 665, 669 (1966) (explaining that if applicant is denied admission based on character and fitness investigation, due process requires that applicant be given notice of charges and opportunity for hearing and to confront witnesses who supply adverse information). Applicant was aware of the "charges" against him. The Committee member who investigated applicant specifically noted his concern that the WSBA, in its disbarment notice, alleged that applicant had repeatedly filed frivolous pleadings and disregarded court orders in Ohio and elsewhere. Applicant was therefore on notice that these matters could be addressed in connection with his character and fitness investigation. He had a chance to respond to the decisions, and did so in his reply brief.[15] Applicant will not be permitted to benefit from his own failure to provide complete and candid information in connection with his bar application.

¶ 47. For the above reasons, we conclude that applicant has failed to meet his burden of demonstrating the good moral character necessary for admission to the Vermont bar.

¶ 48. At oral argument, applicant requested to be permitted to reapply for admission less than two years from the date of the Committee's denial if this Court affirms the Committee's decision. See V.R.A.B. 19 (providing that applicant who is denied certification of good moral character and fitness may not reapply for admission for two years from denial). In light of the record in this case, we see no reason to grant this request, and it is denied.

Affirmed.

FOR THE COURT:

_____
Associate Justice

---

[15] Applicant argues that the Ohio cases were too remote in time to be relevant to his application. This argument is meritless. As noted above, the application required applicant to disclose every case in which he was a named party—not just recent cases. Further, the decisions show that applicant was actively involved in litigation in Ohio as recently as 2015.